## 9306

### WEBBER, AS ADMR., v. SOUTHERN LIFE & TRUST CO

#### (88 S. E. 124.)

NEW TRIAL — APPEAL AND ERROR — ISSUES — INSURANCE — FORFEITURES— WAIVER.—Where in an action on a life insurance policy, which the defendant claimed had lapsed for nonpayment of premiums, the answer to the question whether there had been a waiver of the forfeiture depended on inferences to be drawn from the facts in the case, the order of the trial Judge refusing a new trial will be sustained.

Before SMITH, J., Union, April, 1915.    Affirmed.

Action by J. H. Webber, as administrator of the estate of Myrtle H. Webber, deceased, against Southern Life & Trust Company. From judgment for plaintiff, defendant appeals. The facts are stated in the order refusing a new trial as follows:

"These actions were commenced on the 1st day of December, 1914, against the defendant for the purpose of recovering amounts due on certain contracts, or policies of insurance, which it is alleged the defendant issued on the life of the plaintiff's intestate, his wife, who died on the 24th day of June, 1914.

In date of issue, stipulations and conditions, the two policies are similar, the only difference being in the value thereof, one designed as number 10674, being for the sum of one thousand dollars, and the other known as number 10673, being for the sum of two thousand dollars. The pleadings in both causes are identical and by agreement of counsel were tried together before me and a jury at the February, 1915, term of the Court, resulting in a verdict in both causes for the plaintiff, for the full amount in each case, with interest from October 20th, 1914, counsel for the plaintiffs only contending for interest from that date.

The defendant submits a motion for a new trial in each case upon the following grounds, which are substantially the

same upon which a motion to direct a verdict was made, and overruled:

1. "Because the verdict is not sustained by the evidence, but is contrary to the law and the evidence in this case, in that the evidence shows that the policies sued on had been forfeited for nonpayment of the premium notes, at the maturity of same, and notice of such forfeitures promptly given."

2. "That the evidence fails to show a waiver of said forfeitures on behalf of the defendant."

3. "And, as to the two thousand dollar policy, being No. ———, the evidence shows that there was no attempt to pay the premium note on said policy and no attempt to renew same, even if the letter of J. H. Webber to the defendant bearing date March 30th, 1914, was mailed on said date."

4. "The evidence clearly shows that the insured and her husband and agent, J. H. Webber, treated the policies as having lapsed, as having been forfeited for nonpayment of the premium notes, after the second day of April, 1914, by failing and refusing to reply to any of the notices from the defendant to the effect that said policies had lapsed, until about two months after the death of the insured which occurred on June 24th, 1914."

The complaints allege, in substance:

That the defendant is a corporation duly organized and existing under the laws of the State of North Carolina, with agencies and agents in Union county, in the State of South Carolina; that, in consideration of the application and payment of the premiums agreed upon the defendant issued to the plaintiff's intestate, Mrs. Myrtle H. Webber, certain policies of insurance, whereby it insured the life of the said Myrtle H. Webber and promised to pay to her estate in one policy the sum of one thousand dollars and in the other the sum of two thousand dollars in the event that the said Myrtle H. Webber died before she attained the age of

sixty-one years, and that she departed this life before that time, namely, on the 24th day of June, 1914; that the defendant refused to pay said amounts, although demand has been made upon it for the same, and that the plaintiff is the duly appointed and authorized administratrix of her estate.

The policies contain the following stipulations:

D. "I hereby apply for $1,000—$2,000—participating Economic ——————: Years endowment—term—insurance rated age 25 with an initial premium of $15.08—$30.16 —and annual premiums in advance of $15.08—$30.16— from the beginning of the second policy year one year from date of issue on November 2, 1913, to continue during life."

"I also agree that if the contract now applied for be issued it shall not take effect until delivered, and the first premium thereon shall have been paid during my life and good health."

1. "Only the president, a vice president, secretary or treasurer is empowered by the company to make this contract, or to modify any of its provisions, or to extend the time for paying any premium, or to waive any forfeiture, or to bind the company in any manner whatsoever. These powers cannot be delegated, and must be exercised only in writing, which shall be the only evidence of such exercise."

2. "All premiums, except the first which is payable to the company's agent on the delivery of this policy, are payable at the home office, but may be paid on or before the dates due, or with interest added within thirty-one days thereafter, to the company's agent, in exchange for receipts signed by one of the above officers and countersigned by the agent. If any premium be not paid when due, this policy shall be void and all premiums forfeited to the company, except as herein provided."

"This policy is issued in consideration of the statements and agreements contained in the application therefor and of thirty and 16-100 dollars, paid to the company on or before

the delivery hereof, said sum constituting payment for the insurance for the term ending on the 31st day of December, 1913, which is the end of the first policy year, and in further consideration that on or before said date, and on or before the 31st day of each month of December thereafter, during the life of the insured, there shall be paid to the company in renewal hereof the sum of thirty and 16-100 dollars, until fifty-one full years' premiums in all have been paid."

The defendant relies, so far as its affirmative defense is concerned, upon a forfeiture of the policy which it alleges resulted from the failure by plaintiff's intestate to comply with these stipulations in the policy.

It was not disputed in either cause that the first premium due on the 31st day of December, 1912, was paid, and that the plaintiff's intestate sought and obtained an extension of time for the payment of the second premium, which was due on the 31st day of December, 1913. The time for the payment of these premiums was extended to the first of April, 1914, and premium notes were given to secure the amounts.

There is no provision in the policies providing for a forfeiture thereof upon the failure to pay a premium note, but the notes in this case contained the following provision:

"This note shall not be deemed a payment of the aforesaid premium, but is given in consideration that the above named policy shall not be subject to lapse before the due date hereof. If this note be not paid when due, then, without grace and without further notice, the said policy shall lapse and become void, except as otherwise provided therein, but there shall still be due and payable hereon the amount, with interest, of the premium earned on said policy, reckoned *pro rata* on the rate named in said policy, less any payments already made to the company on account of said premium."

·While there is some conflict of authority, the great weight seems to be in favor of the following principle:

"If the time within which a premium or any part of it must be paid is enlarged by the acceptance of a note upon a condition provided for on the policy, or expressed in the note, that if the note is not paid at maturity the policy shall be void, payment must be made within the time agreed upon or the policy will become null and void. But a different rule is to be applied where neither the policy nor the note contains such provision." 19 A. &. E. Ency. Law, page 47.

The jury were substantially so instructed in this case, and under this view of the law, and the issues made by the pleadings and testimony, the real question was whether the notes, one or both, were paid at maturity, and if not was there a waiver of forfeiture.

The plaintiff does not contend that there was a payment of said notes at maturity *in full.* He testified that at the time of his interview with the agent, Alexander, when he sought an indulgence in the time for payment of his premium notes:

"I made out a check for a *third* of the amount on *both policies.*"

Our Supreme Court in the case of *Huestess* v. *Insurance Company,* 88 S. C., at page 38, 70 S. E. 403, quotes with approval from the case of *Ins. Co.* v. *Eggleston,* 96 U. S. 577, the following statement of the doctrine of waiver:

"Forfeitures are not favored in the law, and Courts are always prompt to seize hold of any circumstance that induces an election to waive a forfeiture or an agreement to do so, upon which the party has relied and acted. Any agreement, declaration or course of action on the part of an insurance company which leads a party insured honestly to believe that, by conforming thereto, a forfeiture of his policy will not be incurred followed by due conformity on his part, will and ought to estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract."

On this question, is the finding of the jury supported by such weight of the testimony as will justify its approval?

The burden of proof is on the plaintiff to establish a waiver.

The plaintiff testified in part, in his direct examination, as follows:

Q. Mr. Webber, after having given those notes state what, if anything, you did with regard to those notes on the 30th of March, 1914? A. I went to Mr. C. N. Alexander's office, the insurance agent's office. Q. The insurance agent of this company? A. Yes, sir; of this company, and asked him about paying the notes; told him they were due tomorrow. He says, "All right." I said, "I can't pay it all; I would like to pay a part of it." He said, "All right, you can pay a third of it, and carry the other for 30 or 60 days." And I made out a check for a third of the amount on both policies, and gave him the check, and he wrote a letter and sealed it up in an envelope and stamped it himself—a self-addressed envelope. And I was on my way to the postoffice. I worked at the postoffice. He went on to get his mail. That same morning I asked him if it was in plenty of time. He said it was. He would get if off on this morning's train and it would reach Greensboro that afternoon, and it would be all right, and he mailed the letter.

There was offered in evidence a letter, which is referred to in the above extract from the plaintiff's testimony and which he says he signed. This letter was directed to the defendant, at Greensboro, N. C., and was as follows:

"I beg to hand you herewith my check for $15.30, being in payment of my note for premium due under policy No. 10674, $15.08, and interest on my note for premium on policy No. 10673, twenty-two cents.

"Will you kindly send me note for the premium due under policy No. 10673 for sixty days? If you will grant me this favor I will appreciate it very much."

It will be observed that there is some discrepancy in the testimony given by the plaintiff at the trial of the case as to what transpired between him and the agent on the 30th day of March, 1914, and the contents of the letter offered in evidence. At the trial plaintiff testified that he "made out a check for a third of the amount on both policies and gave him (the agent) the check." By reference to this letter it would seem that this check was designed to cover the amount due on one policy and the interest on note for premiums on the other policy, which it seems amounted to 22 cents. The plaintiff also testified that the agent "wrote a letter and sealed it up in an envelope and stamped it himself—a self-addressed envelope." In view of the fact that there is testimony going to show that the plaintiff entrusted the matter largely to the agent and that he made out a check for "one-third on the amount on both policies," gave the same to the agent and the phrasing of the letter was left absolutely to the agent, it was peculiarly within the province of the jury to ascertain just what took place between the parties at the time. If it was understood between the plaintiff and the agent that the transaction was to be of a certain character and that the check was to cover a third of the amount on both policies, that is, the parties contemplated a part payment on each policy—and the agent afterwards in writing the letter submitted a different proposition without the knowledge of the plaintiff, even though he signed it, assuming that it carried out the original purpose, then if the agent had the right to act in the premises, either expressly or impliedly, from his acts, conduct or course of dealing which the company permitted and authorized, the plaintiff's intestate could not suffer thereby.

"A principal is bound by the acts of his agent, even when he is actuated by a fraudulent intent, when he acts within the scope of his authority." *Huestess* v. *Ins. Co.*, 88 S. C. 31, 70 S. E. 403.

The plaintiff testified further as follows:

"Q. State whether you relied upon the fact that Mr. Alexander knew what he was talking about when he said it was all right to do it that way? A. Yes, sir; he attended to other business for me through that company, and it had been proved all right, and I supposed this would be. He carried on other business dealings with me. Q. He attended to the arrangements of the notes in the first place? A. Yes, sir; wrote for the notes for me. The Court: Did what? A. He got the notes for me. Q. Do you know what other things he did as agent at Jonesville? A. He was the general agent there for them. Whatever the line of business was he attended to for them—insurance and loaning money on real estate and all like that. Q. Do you know whether he looked after lapses and all that kind of thing for them? A. I guess so. Mr. Sawyer objects. Objection sustained. Q. Do you know anything else he did for the company there? A. He solicited insurance for them, and was a general agent there for them in every particular—was considered so. Q. Mr. Webber, if he had not told you it was all right to have done it that way what would you have done? A. I would have sent the full amount to them at once."

On his cross-examination he testified in part as follows:

"Q. Mr. Webber, when you received the policy and paid the first premium you paid that direct to Alexander? A. Yes, sir. Q. That is the only money, the only premium, you attempted to pay to Alexander until after your wife's death? The others you dealt directly with the company? A. No, sir; I dealt with Mr. Alexander. Q. I mean so far as actually paying the money, that is the only premium that you paid Alexander was the first premium? A. Well, I gave him a check for a part of the notes there. Q. You sent a check to the company? A. I gave it to Alexander, payable to the company. Q. You mailed a letter to the company with the check? A. Yes, sir. Q. Why didn't you send it to the company? A. He attended to my business. Q. Why didn't you pay that money to Alexander

that day instead of mailing a check to the company? A. He told me to make out a check to the company. Q. Didn't he tell you that he could not receive any premiums except the first? A. No, sir, he did not; he said he had received money and send his personal check. Q. Then, why was it that you didn't give him the money and him send his check to the company? A. I suppose it saved him the trouble of making a check to the company for one-third of it. The point I am trying to get is, if he was the agent in the sense that he could receive payments outside of the first why didn't you pay it to him and let him send it to the company? Isn't it a fact that you know he had no right to receive money outside of the first premium? A. No, sir; he did the business and everything went along nicely until then. Q. That was the only time that you gave him any money except the first premium? A. No, sir; I had given him my check to the company. Q. But that wasn't payable to Alexander; he couldn't collect it? A. It was paid to his company."

Again:

"The Court: Mr. Webber, I may not have caught the reply to the question correctly. Who brought you those notes? A. I don't remember; I think the agent brought them. The Court: Whose agent? A. The agent of the Southern Life and Trust Company. The Court: What is his name? A. C. N. Alexander."

The witness, Alexander, who was the agent of the defendant at Jonesville, and with whom the plaintiff conducted the transaction, testified, in part, in the direct examination, as follows:

"Q. Mr. Alexander, state what were some of the things that you did for this company at Jonesville as its agent; what did you do as to loaning money, for instance? A. The Jonesville Insurance, Loan and Realty Company, of which I am secretary and manager, acted as agents for the Southern Life and Trust Company, and for the Underwriters of Greensboro, Southern Stock Fire Insurance Company and

Southern Underwriters Union and McAllister Loan and
Sale Agency; and in loaning money we were furnished
blanks from the home office, and took applications, giving
a complete description of the property, and sent them to the
home office.   Q. What did you do as to employing attor-
neys?   A. We employed attorneys as we saw fit to employ,
and we employed several and negotiated several loans; and
in no case did they object to the attorneys employed.   Q.
What did you do as to looking after lapses of the policies?'
A. Usually in event of lapse, we got a similar notice, and
if we thought it advisable we would see if we could get
it reinstated.   It was to our interest to do that, because we
had a contingent commission; and I would see the assured
and see if we could get them reinstated."

On the cross-examination, the witness testified, in part,
as follows:

"Q. When the check was mailed the check was made
payable to the company?   A. Yes, sir.   Q. And that was
the general custom, wasn't it, except the first premium?   A.
Yes, sir.   Q. The general custom was that the agents didn't
have authority to collect except for the first premium?   A.
The customs are that the agents do not generally collect,
but I did collect.   Q. You have stated two instances of it
a while ago?   A. Yes, sir; and I can state more.   Q. But
that wasn't in accordance with the rules of the company for
you to receive premiums?   A. No, sir; it.was not."

The witness, Alexander, gave the following very signifi-
cant testimony:

"Q. Mr. Alexander, I believe that you were the agent
that handled the writing of these policies on the life of Mrs.
Myrtle H. Webber?   A. That took the application for
them; yes, sir.   Q. And you subsequently had other deal-
ings with regard to the policy?   A. Yes, sir.   Q. Mr. Alex-
ander, I show you a letter, bearing date June 12, 1913,
addressed to the agents of the Southern Life and Trust
Company, printed by the Southern Life and Trust Com-

pany, by S. A. Holleman, auditor. Did you, as agent, receive that letter from the Southern Life and Trust Company? A. Yes, sir."

The letter just above referred to is as follows:

"To the agents of the Southern Life and Trust Company: Heretofore it has been our custom, when requested by a reliable policyholder, to give indulgence with interest on an entire premium not exceeding ninety days from due date, and, if then further requested, to extend three-fourths of the premium ninety days longer upon payment of the one-fourth.

"This is now changed only in the matter of the part payment at end of ninety days, which in future will be one-half instead of one-fourth.

"Please do not in anywise intimate that we will give indulgence beyond that outlined above, as we have no right to discriminate.

"This change will be effective for any premium due on or after July 1st, 1913. Yours truly, Southern Life & Trust Company, by S. A. Holleman, auditor. Greensboro, N. C., June 12, 1913."

Why was this letter addressed to the agents at all if the company did not contemplate that in the course of its business the information contained therein, and the advantage therein offered to its policyholders, would be tendered in proper cases, to wit, through its agents? This letter contains a direct and positive communication to its agents that under certain conditions an indulgence will be granted in the matter of payment of premiums. It has been held that:

"A circular slip issued and put in circulation by the company, stating that certain grace is allowed upon all its policies, is admissible in evidence against it to show waiver, as against a forfeiture of the policy for nonpayment of a premium at the time specified." 19 A. & E. Ency. Law, page 56.

Of course, the policyholder must have been induced to believe that in view of the offer contained in the letter that the days of grace would be allowed.

Suppose that the letter offered in evidence here had been sent direct to each policyholder, it could not be contended that a forfeiture of the policy would have resulted from conduct induced by the representations contained therein. Should the insurer be put in a better position when it adopts a settled policy of indulgence towards its policyholders and authorizes its agents to make same available? The conclusion cannot be avoided that such was the company's purpose as clearly disclosed on the face of its circular letter. The instruction is clothed in language of significant and unmistakable import when it declares:

"Please do not in anywise intimate that we will give indulgence beyond that outlined above, as we have no right to discriminate."

Was this not a definite instruction that in those cases where the indulgence was not "beyond" that outlined above, that agents could "intimate" that it would be granted. Now, if the insurer thus authorized the agent to represent it in this very matter and the authority was exercised, and the insured relied upon it and so acted, could there be a stronger statement of the necessity for, or justification of, that legal policy which frowns upon a forfeiture and extends, at all times, a most generous welcome to a waiver.

In this case the plaintiff testifies that if he had not believed that the agent had authority to make the arrangements with him that he would have paid the amount in full.

It seems to me that there is testimony, and very strong inference, therefrom to justify the conclusion that the agent had the necessary authority under all the facts and circumstances connected with his agency and the method of dealing with policyholders. If, then, under these circumstances, the plaintiff, acting for his intestate, honestly believed that the authority existed, and acted upon it, and

the agent of the company treated with him on this basis, the plaintiff certainly should not suffer when he was in position to pay the whole amount, and only failed to do so upon the representation and assurance of the agent that a part payment would be satisfactory.

The extract from the testimony of the defendant's agent, which is set out below, shows that in the transaction between the plaintiff and himself that he had in mind the provisions of this circular letter. The testimony referred to is as follows:

"A. He came to me and told me—he said that his premium for the notes that he had given the Southern Life and Trust Company would be due tomorrow. He said it was not convenient for him to pay it all unless it was absolutely necessary; and I said—heretofore they have accepted a fourth of the premium and would carry the difference for 90 days longer, and the balance would be continued for 90 days longer; and I told him I thought that had been changed, but I thought it would be a third, or a half; and he said, 'I can pay a third all right;' and I wrote the letter. Q. And who mailed it? A. I mailed the letter myself. Q. Did you have any question about its being accepted? A. No, sir; I didn't myself, personally. Q. What had you done previously in regard to similar matters? A. Invariably when the parties wanted extensions on their premiums —the parties would come to me, and in some cases I would write a letter direct to the company, and they would send them, and in sending the notes back granting this extension, in several cases they sent the notes to me. Q. Had it ever been refused before? A. Never had been refused before; no, sir."

The following testimony of the plaintiff was clearly to the effect that the only basis of the company's action in regarding the policies as having lapsed was the failure of the check to reach the office on time:

. "Q. Now, Mr. Webber, have you ever received in any way, any notice from this company, the Southern Life and Trust Company, repudiating in any way the agreement that was made with Mr. Alexander? A. I don't know whether I understand what you mean. Q. Have they ever written you in any letter that it was not all right to have paid that one-third? A. Why, no; they only write me that they had received the one-third too late to pay the premium—to pay the note. Q. Have you had any communication whatever that the one-third was not all right? A. No. Q. Mr. Webber, you say you received notice that it wasn't received in time? A. Yes, sir; I received notice that the check was not received in time. Q. What were you required to do? A. I was asked to get a health certificate. Q. When was that notice that it was not received in time—did you get it—what was the date of it? A. I don't know; I think it was the second or the third. Q. Of what month? A. April. Q. Of what year? A. 1914."

While in a motion for a new trial the trial Judge has, to a degree, the right to determine the weight of the testimony, yet this would not warrant the practice of substituting his judgment on the facts for that of the jury.

It is well said in the case of *McGhee* v. *Wells,* 57 S. C., 288, 35 S. E. 529, that, "If it were a rule of law that new trials must be granted whenever the Court does not coincide with the jury on the facts, then the granting of new trials for errors of fact would not rest as it does in the sound discretion of the trial Court."

After a very careful consideration of these causes, my conclusion is that there is competent and relevant testimony tending to establish the result of the verdicts of the jury with such a degree of force as to make an interference therewith unwarranted in the exercise of a sound discretion, and it is, therefore,

Ordered, that the motion for a new trial in both cases, upon all grounds submitted, be, and the same is hereby, overruled.

*Mr. John Ashby Sawyer,* for appellant, cites: *As to waiver:* 96 S. C. 375; 95 S. C. 1; 37 S. C. 417; 25 L. R. A. (N. S.) 18; 72 S. C. 216; 71 S. C. 359; 85 Ky. 677; 4 S. W. 787; 77 Iowa 229; 137 Pac. 869; 72 S. E. 863; 117 Wis. 531; 94 N. W. 295; 86 Ill. App. 315; 89 Tex. 604; 35 S. W. 1050; 77 C. C. A. 121; 146 Fed. 695; 80 N. Y. 32; 29 Pa. St. 198; 72 Am. Dec. 622, 624; 228 U. S. 364; 34 Ann. Cas. 1914d, 1029; 200 Mass. 510; 86 N. E. 938. *Distinquishes:* 101 S. C. 249. *Jury disregarded charge:* 102 S. C. 1.

*Messrs. Wallace & Barron* and *W. W. Johnson,* for respondent, submit: *Issues for jury:* 97 S. C. 116; 99 S. C. 397; *Ib.* 432; 100 S. C. 43. *Agency:* Civil Code 2712, 2729. *Forfeitures not favored:* 88 S. C. 39; 81 S. C. 152; 57 S. C. 358. *Authority of agent to waive:* 97 S. C. 379. *Failure to return check:* 96 S. C. 379.

March 3, 1916.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

These two cases were heard on Circuit and in this Court together. They were suits on two policies of life insurance. The issuance of the policies were not denied. The appellant claimed that the policies had lapsed for nonpayment of premiums. The plaintiff relied upon waiver. Waiver was the question in these cases and waiver is the question for the jury.

The appellant says, "His Honor correctly charged the jury and there is no exception thereto." Appellant states four questions. The defendant moved for a direction of

a verdict for the defendant. This was refused and a verdict was had for the plaintiff.

1. Did the policies lapse or become forfeited for nonpayment of premium notes on March 31, 1914, and before the death of the insured?

2. Was there sufficient evidence of waiver of the forfeiture to require such issue to be submitted to the jury?

3. As to the suit on the $2,000.00 policy, No. 10673, was there a forfeiture?

4. The fifth exception charges error in his Honor's refusal to grant new trials in four subdivisions—the grounds of the motions therefor being practically the same grounds for directed verdicts.

It will be seen that the answer to these questions depend upon the inference to be drawn from the facts in the case. Those answers are questions for the trial Court.

Judge Mendel L. Smith, who heard the causes on Circuit, in a carefully prepared order, holds that the evidence was sufficient and that order is sustained. (Let the order be reported.)

The exceptions are overruled.

The judgment is affirmed.